UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

TRICIA GUALTIERI O/B/O M.J.G.,

   Plaintiff,

  v.             1:17-CV-821
                 DECISION AND ORDER
COMMISSIONER OF SOCIAL
SECURITY,

   Defendant.

---

  On August 17, 2017, the plaintiff, Tricia Gualtieri, on behalf of the claimant, M.J.G., a minor child under 18 years of age, brought this action under the Social Security Act ("the Act"). She seeks review of the determination by the Commissioner of Social Security ("Commissioner") that M.J.G. was not disabled. Docket Item 13-1. On March 22, 2018, the plaintiff moved for judgment on the pleadings, *id.*; on May 9, 2018, the Commissioner responded and cross-moved for judgment on the pleadings, Docket Item 15-1; and on May 30, 2018, the plaintiff replied, Docket Item 17.

  For the reasons stated below, this Court denies Gualtieri's motion and grants the Commissioner's cross-motion.

## **BACKGROUND**

### I. PROCEDURAL HISTORY

  On May 30, 2013, Gualtieri applied for Children's Supplemental Security Income benefits on behalf of M.J.G. Docket Item 6 at 21. Gualtieri alleged that M.J.G. had

been disabled since January 1, 2010, and was currently disabled. Docket Item 1 at 1, Docket Item 6 at 151.

On September 6, 2013, Gualtieri received notice that her application was denied because M.J.G. was not disabled under the Act. Docket Item 13-1 at 1. She requested a hearing before an administrative law judge ("ALJ"), *id.*, which was held on June 19, 2015. Docket Item 6 at 40. The ALJ then issued a decision on February 3, 2016, confirming the finding that M.J.G. was not disabled. *Id.* at 34. Gualtieri appealed the ALJ's decision, but her appeal was denied, and the decision then became final. Docket Item 13-1 at 2.

## II. CHILDREN'S DISABILITY STANDARD

A child under 18 is disabled under section 1614(a)(3)(C)(i) of the Social Security Act if he or she has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." In denying Gualtieri's application, the ALJ evaluated her claim under the Social Security Administration's three-step evaluation process to determine whether an individual under the age of 18 is disabled. *See* 20 C.F.R. § 416.924(a).

At the first step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity ("SGA"), defined as work activity that is both substantial and gainful. *Id.* § 416.972. "Substantial work activity" involves significant physical or mental activities. *Id.* § 416.972(a). "Gainful work activity" is work usually done for pay or profit, whether or not profit is realized. *Id.* § 416.972(b). If the claimant is engaged in SGA, the claimant is not disabled regardless of medical condition, age,

2

education, or work experience. *Id.* at § 416.924(b). If the claimant is not engaged in SGA, the ALJ proceeds to the next step. *Id.*

At step two, the ALJ must determine whether the claimant has a medically determinable impairment, or combination of impairments, that is "severe." *Id.* at § 416.924(a). For a claimant under the age of 18, a medically determinable impairment or combination of impairments is not severe if it is a slight abnormality or a combination of such abnormalities that causes no more than minimal functional limitations. *Id.* § 416.924(c). If the claimant has a severe impairment, the ALJ proceeds to the third step. *Id.* § 416.924(a).

At step three, the ALJ must determine whether the impairment or combination of impairments meet, medically equal, or functionally equal an impairment in the listings. *Id.* § 416.924(d). If the claimant has an impairment or combination of impairments that meet, medically equal, or functionally equal the severity of one in the listings, and if such impairments have lasted or are expected to last for a continuous period of at least 12 months, then the claimant is disabled. *Id.* § 416.924(d). If not, then the claimant is not disabled. *Id.*

To determine whether impairments functionally equal one in the listings, the ALJ assesses the claimant's functioning in six separate "domains": (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. *Id.* § 416.926a(b)(1). That assessment compares how the child performs in each of these domains with the typical functioning of a child of the same age without impairment. *Id.* § 416.926a(b). The child's impairment is of listing-level

severity if there are "marked" limitations in at least two domains, or an "extreme" limitation in one domain.  *Id.* § 416.926a(d).  In determining whether impairments are "marked" or "extreme," the ALJ considers functional limitations that result from all impairments, including impairments that have been deemed not severe, and their cumulative effects.  *Id.* §§ 416.923, 416.924a(b)(4), 416.926a(a), (c), and (e)(1)(i).

A "marked" limitation results when impairments "seriously interfere with [the child's] ability to independently initiate, sustain, or complete activities."  *Id.* § 416.926a(e)(2)(i).  A "marked" limitation is "more than moderate" but "less than extreme."  *Id.*  On a standardized test designed to measure abilities within a certain domain, a "marked limitation" means a score of at least two, but less than three, standard deviations below the mean and a level of day-to-day functioning consistent with that score.  *Id.* § 416.926a(e)(2)(i), § 416.926a(e)(2)(iii).  For example, in the domain of "health and well-being," a child is considered to have a "marked" limitation if he or she is frequently ill as a result of his or her impairments or exhibits frequent worsening of symptoms resulting in medically-documented exacerbations.  *Id.* § 416.926a(e)(2)(iv).  "Frequent" means episodes that occur on average every four months and lasting two weeks or more, or more often than three times a year but lasting less than two weeks, or less often but of overall equivalent severity.  *Id.*

An "extreme" limitation, on the other hand, results when impairments "interfere[ ] very seriously with [the child's] ability to independently initiate, sustain, or complete activities."  *Id.* § 416.926a(e)(3)(i).  An "extreme" limitation is one that is "more than marked."  *Id.*  The ALJ will determine a limitation to be "extreme" when a comprehensive standardized test designed to measure functioning in a particular domain results in a

4

score of three or more standard deviations below the mean and day-to-day functioning consistent with that score.  *Id.* § 416.926a(e)(3)(iii).  In the domain of "health and well-being," for example, the ALJ will consider a child to have an "extreme" limitation if the child is frequently ill or if impairments frequently become exacerbated, resulting in medically documented symptoms significantly more than those of a "marked" limitation. *Id.* § 416.926a(e)(3)(iv).

### III.     RELEVANT MEDICAL EVIDENCE

The following summarizes the medical evidence most relevant to Gualtieri's claim.  M.J.G. was examined by several different providers, but two, Jennifer Meyer, M.D., and Sarah Cook, M.D., are of most significance to the claim of disability here.

#### A.     Jennifer Meyer, M.D., Pediatrician

Dr. Meyer is a state agency medical consultant and pediatrician.  Docket Item 15-1 at 9.  She assessed M.J.G.'s capabilities based on the record as of September 6, 2013.  *Id.*  Dr. Meyer considered all evidence in the record—including medical opinions, physical and mental state test results, and school/pre-school records.  Docket Item 6 at 84, 86.  As a result, she diagnosed M.J.G. as having oppositional defiant disorder (ODD), asthma, mood disorders, and attention deficit hyperactivity disorder (ADHD), all of which she found to be severe, medically-determinable impairments (MDIs).  *Id.* at 85.  She also found, however, that these MDIs did not "meet, medically equal or functionally equal the listings."  *Id.*

In evaluating whether the limitations were medically equivalent to those of a listed impairment in 20 C.F.R. § 416.926a(b)(1), Dr. Meyer reported no limitations in domains one through four.  *Id.*  She noted less-than-marked limitations in domains five

5

and six, "caring for yourself" and "health and physical well-being," respectively. *Id.* at 86. In domain five she acknowledged that M.J.G. was undergoing treatment for anxiety. *Id.* In domain six she cited his asthma diagnosis. *Id.* In domains one through five, Dr. Meyer noted that M.J.G.'s teacher had reported no problems. *Id.* The teacher was unable to comment on domain six, "health and well-being," due to lack of knowledge. *Id.*

Dr. Meyer acknowledged that M.J.G. was receiving treatment for anxiety issues and that he had been diagnosed with asthma. *Id.* at 86. With regard to anxiety, Dr. Meyer further noted that M.J.G. was taking Citalopram and received counseling at Child and Adolescent Treatment Services. *Id.* With regard to asthma, Dr. Meyer noted a spirometry report dated December 31, 2012, which found a moderately severe obstruction, but she observed that M.J.G. used Albuterol only infrequently and as needed. *Id.*

**B.    Sarah A. Cook, M.D., Pediatrician**

Dr. Cook, a pediatrician, initially saw M.J.G. for asthma on November 27, 2013, at Lakeshore Primary Care Associates. *Id.* at 411. M.J.G. was taking Flovent regularly at that time. *Id.* Cold air triggered his asthmatic symptoms, but he "fe[lt] better with the medicine pretty quickly." *Id.* at 411. Dr. Cook observed that M.J.G. was too dependent on Albuterol, using it once or twice a week, and so she "stepped up" his medication to include Advair. *Id.* at 412.

In her notes from multiple visits, Dr. Cook observed that M.J.G.'s asthma was mild and intermittent, and on October 22, 2014, she removed Advair from his treatment regimen. *Id.* at 422, 424, 426, 428, 446. She also noted that flare-ups of M.J.G.'s asthma were treated with Albuterol no more than once a week and that no additional

6

medication was necessary to manage his symptoms.  *Id.* at 428.  And she observed that M.J.G. had never been hospitalized for his asthma.  *Id.* at 71.

Dr. Cook also saw M.J.G. for about eighteen months—from November 2013 until April 29, 2015—in connection with his ODD and episodic mood disorder.  *Id.* at 411, 447.  At the time of his initial visit, M.J.G. was not seeing a counselor, although Dr. Cook recommended that he do so to address his behavioral issues.  *Id.* at 417.  Dr. Cook noted that M.J.G. had no sleep disturbances.  *Id.* at 414.

According to Dr. Cook, M.J.G,'s symptoms early on included very emotional and aggressive tendencies marked by trouble with impulse control and anxiety, and frequent sadness and crying.  *Id.* at 420.  But Dr. Cook also observed that M.J.G. had appropriate mood and affect for his age.  *Id.* at 416, 445.  Dr. Cook found that medication for Attention Deficit Disorder would enable M.J.G. to "stay on task" but that the medication would "wear off around 6[PM]."  *Id.* at 445.  Dr. Cook also reported that M.J.G.'s physical activity level was "active" and that he played baseball "sporadically."  *Id.* at 414, 419.

On August 20, 2014, Dr. Cook noted that M.J.G. was seeing a counselor weekly and that his episodic mood disorder symptoms were improving.  *Id.* at 422.  Dr. Cook also noted that M.J.G. had improved despite the stress of going back to school, which had been a trigger for his anxiety. Although M.J.G. had missed "quite a few days of school" as of October 22, 2014, *id.* at 422, 45, 426, Dr. Cook noted "some progress, some steps backward"—that M.J.G. fluctuated between good and bad weeks but was making "some progress."  *Id.* at 426.  For example, for a month when he was not seeing his counselor, his behavior and mood worsened, he reported feeling out of control with

7

random feelings of anger, and he was unable to cooperate with his siblings. *Id.* at 434. But after MJ.G. returned to counseling with more frequent visits, his mother reported that he stopped crying uncontrollably and that "overall thing[s] seem better." *Id.* at 439, 440, 443.

## IV. THE ALJ'S DECISION

The ALJ determined that M.J.G. was born on August 14, 2002, and therefore was school-aged when the application was filed on May 30, 2013. Docket Item 6 at 24. At step one, the ALJ found that M.J.G. had not engaged in substantial gainful activity since the application date. *Id.* At step two, the ALJ found that M.J.G. suffered from several severe impairments: "attention deficit disorder (ADD), a mood disorder, and asthma." *Id.* Although the ALJ found these impairments to be severe, at step three he determined that they did not meet or equal any of the Childhood Listings in 20 C.F.R. § Part 404, Subpart P, Appendix 1, because the impairments caused only minimal limitations. *Id.*

The ALJ determined that M.J.G.'s condition did not meet listing 103.03 (Asthma) because his symptoms did not meet the necessary "FEV1 values," measuring lung functioning, of Table I in 103.02A. Docket Item 6 at 24; 20 C.F.R. § Part 404, Subpart P, Appendix 1, 103.02A (effective Apr. 29, 2013, to Sep. 2, 2013). For example, M.J.G. did not exhibit persistent low-grade wheezing or growth impairment, nor did he have attacks "requiring physician intervention . . . at least once every 2 months or at least 6 times a year." Docket Item 6 at 24.

The ALJ also determined that M.J.G.'s mental impairments did not meet listing 112.04 (Mood Disorders) because he did not have "a disturbance of mood (referring to a prolonged emotion that colors the whole psychic life . . . ) accompanied by a full or

8

partial manic or depressive syndrome." 20 C.F.R. § Part 404, Subpart P, Appendix 1, 112.04 (A).  According to the ALJ, M.J.G. did not have "medically documented persistence of either, the 112.04A listings . . . along with an 112.02B listing of at least two marked impairments in age-appropriate criteria."  Docket Item 6 at 24; *see* 20 C.F.R. § Part 404, Subpart P, Appendix 1, 112.04 (B), *id.* at 112.02 (B)(2) (effective Apr. 29, 2013, to Sep. 2, 2013).[1]

Finally, the ALJ determined that M.J.G.'s impairment did not meet listing 112.11 (Attention Deficit Hyperactivity Disorder) because he did not exhibit "marked inattention, marked impulsiveness, and marked hyperactivity along with other appropriate age-group criteria."  Docket Item 6 at 25.

As required by 20 C.F.R. § 416.924a(a) and SSR 09-2p, the ALJ considered all relevant evidence in the case record—including objective medical evidence, M.J.G.'s statements, and information from other sources such as M.J.G.'s teachers and family members—in reaching his determination.  *Id.*  The ALJ also explicitly considered the "whole child," as required by 20 C.F.R. § 416.924a(b) and (c) and explained in SSR 09-1p.  *Id.*  In doing so, the ALJ evaluated M.J.G.'s abilities compared to other children his age without impairments, as well as the interactive and cumulative effects of all M.J.G.'s impairments, severe or otherwise.  *Id.*  Finally, the ALJ considered "the type, extent, and frequency of help the claimant needs to function."  *Id.*

---

[1] To meet this listing, a claimant's limitation must be characterized by five or more of the following: (1) depressed or irritable mood; (2) diminished interest in almost all activities; (3) appetite disturbance with change in weight (or a failure to achieve an expected weight gain); (4) sleep disturbance, observable psychomotor agitation or retardation; (5) decreased energy; (6) feelings of guilt or worthlessness; (7) difficulty concentrating or thinking; or (8) thoughts of death or suicide.  20 C.F.R. § Part 404, Subpart P, Appendix 1, 112.04 (A)(1)(a)-(i) (effective Apr. 29, 2013, to Sep. 2, 2013).

In addressing M.J.G.'s symptoms, the ALJ followed a two-step process to evaluate whether (1) there is an underlying medically determinable physical or mental impairment that could be expected to produce his symptoms and (2) the intensity, persistence, and limiting effects of his symptoms interferes with his functioning. Docket Item 6 at 25. As part of his analysis, the ALJ addressed M.J.G.'s abilities in each of the six domains and found less-than-marked limitations in the domains of "caring for yourself" and "health and physical well-being." *Id.* at 32, 33. The ALJ found no other limitations in any of the six domains. *Id.* at 29-32.

## **LEGAL STANDARDS**

When evaluating a decision by the Commissioner, district courts have a narrow scope of review: they are to determine whether the Commissioner's conclusions are supported by substantial evidence in the record and whether the Commissioner applied the appropriate legal standards. *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). Indeed, a district court ***must*** accept the Commissioner's findings of fact if they are supported by substantial evidence in the record. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla and includes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). In other words, a district court does not review a disability determination de novo. *See Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).

**DISCUSSION**

I.    **THE PLAINTIFF'S CLAIMS**

The plaintiff makes two arguments.  First, Gualtieri objects to the ALJ's finding of no issue in domain three, "interacting with others."  Docket Item 13-1 at 13.  This domain involves the child's ability to "initiate and sustain emotional connections with others, develop and use the language of [his] community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others."  20 C.F.R. § 416.926a(i).  Some examples of limitations in this domain include: "[the child has] no close friends, or [the child's] friends are all older or younger" and "[the child] avoid[s] or withdraw[s] from people [he or she] know[s], or [the child is] overly anxious or fearful of meeting new people or trying new experiences."  *Id.* § 416.926a(i)(3)(ii)-(vi).   The child may also "[have] difficulty playing games or sports with rules" or "[have] difficulty communicating with others" or even "difficulty speaking intelligibly or with adequate fluency."  *Id.*  Gualtieri specifically argues that the ALJ erred in his application of the Children's Disability Standards in 20 C.F.R. § 416.924a(b)(3)(i).  Docket Item 13-1 at 14.

Second, Gualtieri objects to the ALJ's reliance on the opinion of Dr. Meyer, arguing that he erred in relying on the opinion of a physician who had simply reviewed records more than a year and a half before the hearing.  *Id.* at 15*.*  In sum, Gualtieri argues that the ALJ's finding is not supported by substantial evidence and that the case should be remanded so that the ALJ can properly consider M.J.G.'s impairments in domain three, "interacting and relating with others," as well as the weight given to Dr. Meyer's opinion relative to other opinions in the record.  *Id.* at 13, 15, 16.

11

## II. ANALYSIS

### A. "Interacting and Relating with Others"

20 C.F.R. § 416.926a(d) provides that a child's limitations meet the severity of the listing if the child displays either "marked" limitations in two or more of the six domains or an "extreme" limitation in one domain. Here, Gualtieri has not presented evidence that M.J.G. has an "extreme" limitation in domain three—or in any other domain for that matter.

Domain three, "interacting with others," considers all aspects of a child's social interaction, including speech and language skills. To have an extreme limitation in domain three, a child must have impairments that "interfere[ ] very seriously with [the child's] ability to independently initiate, sustain, or complete activities" that involve communicating and interacting with other children or with adults. 20 C.F.R. § 416.926a(e)(3)(i).

Here, although M.J.G. had a "mildly distorted vocalic /r/ and a vocal hoarseness," he nevertheless was intelligible and did not require speech therapy. Docket Item 6 at 260. M.J.G.'s speech issues did not interfere with his ability to communicate, and he had frequent sleepovers and was "hanging out" with friends. *Id.* at 314. He played sports in gym class and was on a baseball team. *Id.* at 46, 48, 52. In school, M.J.G. enjoyed science class and gym. *Id.* at 52. In sum, the record demonstrates no severe issues "interacting with others," and Gualtieri has not met her burden of proving that M.J.G. has an "extreme" limitation in domain three.

Gualtieri also has not shown that M.J.G. has a "marked" limitation in domain three, let alone that he has "marked" limitations in two domains. In fact, Gualtieri herself

concedes that the record may "not support a finding of [a] marked limitation[ ]" in domain three.  Docket Item 13-1 at 15; Docket Item 17 at 1.

For all those reasons, the ALJ did not err in concluding that M.J.G. had no limitation in "interacting and relating with others."  And even if the ALJ had erred and M.J.G had a marked limitation in domain three, that error would have been harmless because a marked limitation in *two* domains is necessary to meet the listing.  20 C.F.R. § 416.926a(d).  Thus, this Court is not persuaded by Gualtieri's argument about domain three, "interacting with others."

### B. Staleness of Dr. Meyer's opinion

Gualtieri also argues that the ALJ erred in relying on the opinion of the non-examining review physician, Dr. Meyer.  More specifically, she contends that it is clear the ALJ gave "great weight" to Dr. Meyer's opinion because the ALJ's findings match those of Dr. Meyer.  Docket Item 13-1 at 17.

Gualtieri may be correct that the ALJ gave great weight to Dr. Meyer's opinion.  But because Dr. Meyer's opinion is consistent with the rest of the record and is internally consistent, there is no reason to discount the ALJ's conclusion.  Furthermore, the records and opinions of Dr. Cook, the treating physician, also support the ALJ's conclusion, so the ALJ may have relied on Dr. Cook's treatment notes as much as on Dr. Meyer's opinion.

In general, "[i]n the context of a psychiatric disability diagnosis, it is improper to rely on the opinion of a non-treating, non-examining doctor because the inherent subjectivity of a psychiatric diagnosis requires the physician rendering the diagnosis to personally observe the patient."  *Velazquez v. Barnhart*, 518 F. Supp. 2d 520, 524

13

(W.D.N.Y. 2007). In *Velazquez*, however, the ALJ erred in discounting the opinions of three examining physicians who had an ongoing treatment relationship with the patient while favoring the opinion of a physician who had never examined the plaintiff. *Id.* Here, on the other hand, the ALJ's decision was consistent with both the non-treating physician's opinion and the treating physician's observations in the record.

Furthermore, "[i]t is well settled that an ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability." *Wilkins v. Comm'r of Soc. Sec.*, No. 1:18-CV-00067, 2019 WL 2500500, at *6 (W.D.N.Y. June 17, 2019). *See* 20 C.F.R. §§ 404.1512(b)(6), 404.1513(c), 404.1527(e). Because Dr. Meyer is a state agency medical consultant and pediatrician, Docket Item 15-1 at 9, the ALJ was permitted to rely on her opinion.

Gualtieri suggests that because Dr. Meyer conducted her "review of the record over one and a half years before the hearing was held," her opinion is stale. Docket Item 13-1 at 15. In support of her argument, she cites *Jones v. Colvin*, 2012 WL 3637450 at *2 (E.D.N.Y. 2012), finding a one-and-one-half-year-old medical opinion to be stale. "A stale medical opinion does not constitute substantial evidence to support an ALJ's findings." *Majdandzic v. Comm'r of Soc. Sec.*, No. 17-CV-1172-FPG, 2018 WL 5112273, at *3 (W.D.N.Y. Oct. 19, 2018).

Gualtieri is correct that Dr. Meyer's report was issued more than a year and six months before the hearing was held.[2] But a "gap of time between when

---

[2] The report by Dr. Meyer was issued on September 6, 2013. Docket Item 6 at 88. The hearing was held on June 19, 2015. Therefore, there was a gap between the two of approximately one year and eight months.

14

an opinion is rendered[,] and the disability hearing and the decision does not automatically invalidate that opinion." *Id.* For a medical opinion to be stale, there must not only be a significant period of time between the date of the opinion and the hearing date, there also must be subsequent treatment notes "indicat[ing] a claimant's condition has deteriorated" over that period. *Whitehurst v. Berryhill*, No. 1:16-CV-01005-MAT, 2018 WL 3868721, at *4, *5 (W.D.N.Y. Aug. 14, 2018). In other words, the "mere passage of time does not render an opinion stale." *Id.*

Here, the subsequent treatment notes do not show that M.J.G.'s condition significantly deteriorated over the relevant period. On the contrary, the notes from M.J.G.'s visits with Dr. Cook show some improvement. In fact, throughout the relevant period, Dr. Cook commented that M.J.G. was "doing better" and "generally improving," indicating that his condition was not deteriorating. Docket Item 6 at 428, 445.

Dr. Cook's notes include two comments that, read in isolation, might indicate some deterioration in M.J.G.'s condition. But these comments address a discrete period when external factors likely contributed to M.J.G.'s feelings of depression and anxiety, as opposed to deterioration of his diagnosed conditions. The first comment, on January 7, 2015, notes that M.J.G. had been "doing worse for at least a month." Docket Item 6 at 436. Dr. Cook attributed this to trouble with his siblings. *Id.* at 434. At his next visit, two weeks later on January 21, 2015, M.J.G.'s mother complained that he was "definitely not better, if anything he [was] the same or worse." *Id.* at 439. But M.J.G. reported feeling stressed about his father's health and had not been acting out. *Id.*

15

Subsequent treatment notes by Dr. Cook indicate that M.J.G.'s condition became "stable," was "generally improving," and was "better than [it had] been." *Id.* at 445. The ALJ therefore correctly determined that M.J.G.'s condition was not deteriorating during the relevant period and appropriately reconciled any conflicting information within Dr. Cook's treatment notes with the record as a whole. *See Matta v. Astrue*, 508 F. App'x 53, 57 (2d Cir. 2013) (holding that ALJ's determination was supported by substantial evidence when the claimant's condition was not always stable but fluctuated over the course of several years because ALJ used treatment notes from a variety of doctors to reconcile changes in claimant's condition to determine that he was not disabled); *see also Clemons v. Comm'r of Soc. Sec.*, No. 5:16-CV-658 (ATB), 2017 WL 766901, at *4 (N.D.N.Y. Feb. 27, 2017) ("Here, the ALJ resolved conflicts between the various medical opinions and the treatment record by assigning the greatest weight to those findings that he deemed most consistent with plaintiff's overall treatment record and activities.").

Moreover, even if the ALJ did err in relying on a stale opinion of Dr. Meyer, any error was harmless because there is nothing in the record suggesting an extreme limitation in one domain or marked limitations in two domains. In domain one, "acquiring and using information," M.J.G. was able to learn and use information effectively, as demonstrated by his making the merit roll in school. Docket Item 6 at 461. In domain two, "attending and completing tasks," M.J.G. was able to complete his schoolwork successfully with the assistance of a 504 plan. *Id.* at 226. In domain four,[3] "moving about and manipulating objects," M.J.G. played sports in gym class, was on a

---

[3] Domain three is addressed above at 12-13.

baseball team, and enjoyed hobbies such as video games and fishing.  *Id.* at 46, 50, 52.

In domain five, "caring for yourself," M.J.G could comb his hair, brush his teeth, and

take a shower—all independently.  *Id.* at 173.  M.J.G also reduced angry outbursts after

counseling, evidence that he was able to appropriately address his emotional needs.

*Id.* at 268.  Finally, in domain six, "health and physical well-being," M.J.G.'s asthma

symptoms were "mild intermittent," abated with the use of his inhaler, and were not

severely limiting.  *Id.* at 416, 420, 424, 428, 446.

In sum, even if the ALJ relied on Dr. Meyer's opinion as the plaintiff suggests,

that reliance was otherwise supported by the record.  And even if it were not

appropriate, that would not change the result.  Gualtieri's argument about the ALJ's

reliance on Dr. Meyer also is not persuasive.

### C. Completeness of the record

The ALJ must develop the record, regardless of whether "the claimant is

represented by counsel or . . . by a paralegal."  *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir.

1996).  But "when a party is represented, the ALJ's obligation [to develop the record] is

lessened".  *Claypool v. Berryhill*, 2018 WL 3386337, *2 (W.D.N.Y. 2018).  And "[w]here

there are no obvious gaps in the administrative record, and where the ALJ already

possesses a complete medical history, the ALJ is under no obligation to seek additional

information in advance of rejecting a benefits claim."  *Rosa v. Callahan*, 168 F.3d 72,

79 n.5 (2d Cir. 1999) (internal quotation omitted).

Gualtieri suggests that the record was "incomplete" and that "the ALJ should

have fully developed the record."  Docket Item 13-1 at 18.  But Gualtieri is incorrect.  In

fact, the record was more than sufficient to support, and to allow the Court to understand, the reasoning behind the ALJ's conclusion.

There were no significant gaps in M.J.G.'s medical history throughout the relevant period. Docket Item 6 at 25. Moreover, the ALJ considered M.J.G.'s subjective reports of his own symptoms, and he addressed all relevant diagnoses. *Id.* The ALJ also considered opinions from M.J.G.'s teachers, social workers, nurses, and physician's assistants who had evaluated him. *Id.* at 26-33. In sum, the ALJ appropriately weighed all the evidence in the entire record, and there were no gaps that needed to be filled in. Therefore, the ALJ had no need to develop the record further. *Pritchett v. Berryhill*, No. 17-CV-719-HBS, 2018 WL 3045096, at *7 (W.D.N.Y. June 20, 2018) ("Ultimately, the duty to re-contact does not arise unless the record is insufficient for the ALJ to determine whether a claimant is disabled."); *Ayers v. Astrue*, No. 08-CV-69A, 2009 WL 4571840, at *2 (W.D.N.Y. Dec. 7, 2009).

Gualtieri suggests that because the opinion of a non-examining consultant is the only opinion in the record, the ALJ was obliged to develop it further. Docket Item 13-1 at 18. But "opinions from consultative physicians can constitute substantial evidence in support of the ALJ's decision, especially in the absence of the opinion of a treating physician." *Sanchez v. Comm'r of Soc. Sec.*, No. 15CIV4914PGGJCF, 2016 WL 8469779, at *10 (S.D.N.Y. Aug. 2, 2016), *report and recommendation adopted*, No. 15CIV4914PGGJCF, 2017 WL 979056 (S.D.N.Y. Mar. 13, 2017). Additionally, "the opinions of consultative physicians can constitute substantial evidence where, as here, their opinions are consistent with the other evidence in the record." *Williams v. Colvin*,

No. 14-CV-921S, 2016 WL 2640349, at *4 (W.D.N.Y. May 10, 2016). So the fact that Dr. Meyer may have been the only physician to offer an opinion is of no moment.

"When there is no treating physician's opinion, the Commissioner must still consider whether the consultative opinions are supported by and consistent with the other evidence in the record." *Daniels v. Colvin*, No. 14-CV-02354, 2015 WL 1000112, at *17 (S.D.N.Y. Mar. 5, 2015), *see also Paduani v. Colvin*, No. 16-CV-2300(LDH), 2017 WL 4351510, at *2 (E.D.N.Y. Sept. 29, 2017) (ALJ was "entitled to rely on [a consultative physician's] opinion" where no treating physician opined as to the claimant's mental status). Here, the ALJ did exactly that. Docket Item 6 at 25. Again, there is no reason to revisit the ALJ's conclusion.

## **CONCLUSION**

The ALJ's decision was not contrary to the substantial evidence in the record, nor did it result from any legal error. Therefore, and for the reasons stated above, Gualtieri's motion for judgment on the pleadings is DENIED, the Commissioner's cross motion for judgment on the pleadings is GRANTED, the complaint is DISMISSED, and the Clerk of Court shall close the file.

SO ORDERED.

Dated:  August 1, 2019
        Buffalo, New York

                                            *s/ Lawrence J. Vilardo*
                                            LAWRENCE J. VILARDO
                                            UNITED STATES DISTRICT JUDGE